```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x
EM LTD. and NML CAPITAL, LTD.,          :

                         Plaintiffs,    :    08 Civ. 7974 (TPG)

        - against -                     :    OPINION

THE REPUBLIC OF ARGENTINA and           :
BANCO DE LA NACION ARGENTINA,
                                        :
                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - x
EM LTD.,                                :

                         Plaintiff,     :    03 Civ. 2507 (TPG)

        - against -                     :

THE REPUBLIC OF ARGENTINA,              :

                         Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - x
NML CAPITAL, LTD.,                      :

                         Plaintiff,     :    03 Civ. 8845 (TPG)
                                             05 Civ. 2434 (TPG)
        - against -                     :    06 Civ. 6466 (TPG)
                                             07 Civ. 1910 (TPG)
THE REPUBLIC OF ARGENTINA,              :    07 Civ. 2690 (TPG)
                                             07 Civ. 6563 (TPG)
                         Defendant.     :    08 Civ. 2541 (TPG)
- - - - - - - - - - - - - - - - - - - - - - - - - x    08 Civ. 3302 (TPG)
                                             08 Civ. 6978 (TPG)
```

Plaintiffs hold defaulted bonds issued by defendant Republic of Argentina. On September 12, 2008, the court signed orders restraining and attaching assets of Banco de la Nación Argentina ("BNA") and the Republic.

Plaintiffs now move to confirm these orders, and for a writ of execution as to certain assets restrained by the orders. BNA and the Republic oppose these motions, move to vacate the orders, and move to dismiss the complaint filed in case 08 Civ. 7974, which seeks a declaratory judgment that BNA is an alter ego of the Republic.

The motions of the parties are granted in part and denied in part.

## Background

### Procedural History

On September 12, 2008, the court signed orders of attachment and restraining orders. The attachment orders were directed to "the right, claim and/or entitlement to recover any amounts, assets, funds or property pursuant to Section 605(11) or 606(4)(b) of the New York Banking Law at the conclusion of any voluntary winding up or involuntary liquidation of the New York Branch of BNA."[1] The restraining orders covered assets held by the garnishee that consisted of either (1) BNA's "asset pledge" deposit made pursuant to Section 202-b(1) of the New York Banking Law[2] or (2) any assets of the Republic of

---

[1] Section 605(11) of the Banking Law provides, in relevant part, that any "foreign banking corporation which has been licensed . . . to engage in business in this state . . . may, if it so desires, take proceedings for the voluntary liquidation of its business and property in this state." Section 606(4)(b) provides that after an involuntary liquidation has occurred, and state regulators have used the bank's assets to pay claims of any creditors, "any [remaining] assets of the foreign banking corporation . . . shall be turned over to the principal office of such foreign banking corporation."

[2] Section 202-b(1) of the Banking Law provides that foreign banks shall keep on deposit at banks in New York assets in an amount "necessary or desirable for the maintenance of a sound financial condition, the protection of depositors and the public interest, and to maintain public confidence in the business of" the bank.

Argentina in a garnishee's custody. Plaintiffs subsequently served the orders on BNA's New York branch, as well as on over 3000 other financial institutions within the state of New York, under the theory that BNA may have made deposits under the New York Bankruptcy Law at any of those institutions.

At the time the orders were issued, EM Ltd., the plaintiff in case 03 Civ. 2507, and NML Capital, Ltd., the plaintiff in case 03 Civ. 8845, had already obtained judgments against the Republic. Therefore, the court issued Restraining Orders in those cases. In cases 05 Civ. 2434, 06 Civ. 6466, 07 Civ. 1910, 07 Civ. 2690, 07 Civ. 6563, 08 Civ. 2541, 08 Civ. 3302, and 08 Civ. 6978, however, NML had not yet obtained judgments. In those cases, the court therefore issued an Order of Attachment. NML subsequently received judgments in cases 05 Civ. 2434, 06 Civ. 6466, 07 Civ. 2690, and 08 Civ. 3302 on May 28, 2009; those judgments were amended on June 12, 2009.

Plaintiffs filed case 08 Civ. 7974 shortly after the entry of the orders. The complaint in that case seeks a declaratory judgment that BNA is the alter ego of Argentina, and seeks to hold BNA liable for the debts owed to plaintiffs by the Republic in the other actions discussed above.

In response to the provision of the orders applying to assets of the Republic, BNA's New York branch restrained funds held in two accounts: over $3.2 million held on behalf of the Agencia Nacional de Promoción Científica y Tecnológica, a division of the Republic's Ministry of Science, Technology, and

Productive Innovation, as well as about $2000 held by the Instituto Nacional de Tecnología Agropecuaria. Both entities will be described later in this opinion.

Plaintiffs move to confirm the attachment orders and restraining orders. With respect to the portions of the orders relating to BNA's asset pledge, BNA opposes the motion to confirm and cross-moves to vacate the orders. With respect to the portions of the orders relating to any assets of the Republic, the Republic opposes the motion to confirm and cross-moves to vacate the orders. In response to the Republic's motion, plaintiffs move for the issuance of a writ of execution relating to the assets of the Republic at BNA's New York branch. The Republic opposes that motion.

Subsequently, the Republic and BNA filed motions to dismiss the complaint in case 08 Civ. 7974 under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), which plaintiffs oppose.

Facts Regarding Alter Ego Issues

BNA was created by the Argentine Congress in 1891, and describes itself as now "the largest commercial bank in Argentina." The employees of BNA number approximately 18,000. BNA has several hundred branch offices, including the branch in New York. It has approximately 2.5 million accounts maintained by depositors ranging in size from small account holders to major international corporations.

-5-

BNA is empowered to litigate, hold property, and enter into contracts in its own name. Although BNA concedes that it is wholly owned by the Republic, it claims that it operates independently from the Republic. However, as plaintiffs note, BNA's website states that the bank's "principal purpose is to perform the function of financial agent for the Federal Government" and that it therefore "receives official deposits and makes payments for account and by order of the Nation."

BNA is governed by a charter enacted by the Argentine government in 1978 in Law 21,799. The charter describes BNA as an "autonomous entity of the State" whose operations are guaranteed by the "Argentine Nation." Its assets are "exempt from payment of any national dues or taxes." The bank is allowed to establish branches in both Argentina and other countries, although it is required to provide prior notification to the Ministry of Economy when opening or closing foreign branches. The charter also provides that the "relations of the Bank with the National Executive Branch shall take place through the Ministry of Economy, except for merely formal issues in which it will communicate directly with the corresponding public departments."

The bank is governed by a board of directors, which is "designated by the National Executive Branch" and must include representatives of a variety of economic sectors. However, members of the board may not have "other positions or posts, compensated or remunerated in any manner,

reporting directly or indirectly to the national, provincial, or municipal governments." The Chairman and members of the board may serve four-year terms, and may be reappointed. If a Chairman or director resigns in the middle of his term, his replacement serves out the rest of that same term (rather than being automatically appointed for another full four-year term). The board is required to meet twice a month and is empowered to set policy and oversee general bank operations. It is also required to appoint a General Manager, who cannot hold "any other salaried position." The board's compensation is "established by the National Executive Power."

The charter also states that BNA "shall coordinate its action with the economic-financial policies established by the national government," and provides that the "primary purpose of the Bank is to provide financial assistance to micro, small, and medium-sized companies, regardless of their economic activity." In support of this mission, BNA "must" finance agricultural activities, support foreign trade, and cover "the needs of" industry, mining, tourism, and other economic activities. BNA may not issue loans exceeding 5 million pesos, except under certain circumstances. In addition to these specific responsibilities, the bank is authorized to perform the usual functions of a bank.

At one time, the BNA charter barred the bank from making loans to "the Nation, provinces, or municipalities, or to their entities or agencies,

unless they have a special guarantee from the Department of the Treasury of the Ministry of Economy that allows for actual automatic reimbursement of the loan." Law N° 21,799, June 16, 1978, at Art. 25.  In November 2008, however, this restriction was largely rescinded by Article 74 of the Argentine National Budget for 2009.  This provision makes BNA "exempt from the restriction contained within Article 25 of Law N° 21,799."  Arg. Nat'l Budget 2009, at Art. 74.  Under the current law, therefore, BNA may make loans to the national government "as long as the funds are destined for the financing of capital spending or amortization of debts" and the total amount of loans to the national government amount to 30% or less "of the deposits of the Non-Financial National Public Sector."  Id.

BNA's compliance with its charter and with other laws is overseen by "a Supervisor designated by the National Executive Branch."  The Supervisor must sign the bank's yearly financial statements and may attend board meetings, though he is not entitled to a vote at the meetings.  He is required to be a lawyer, accountant, or economist, and is appointed for renewable two-year terms.

According to a declaration by BNA's current President, Mercedes Marcó del Pont, BNA's board meets on a weekly basis, and minutes of its board meetings "have been maintained for 117 years."  The board is divided into ten committees, which also meet weekly, and approve significant transactions

entered into by the bank. Del Pont also states that the board's decisions "are not subject to review or approval by the executive branch and no member of the executive branch participates in the day-to-day operations of BNA." Despite the requirement that BNA fulfill certain missions (such as the provision of loans to small businesses), "BNA analyzes each prospective loan and assesses the risks independently of any input from the executive branch." Del Pont also characterizes the management of BNA as "extremely stable." In a separate declaration, BNA's current Supervisor similarly states that the Republic does not exercise control over BNA's daily operations, and that the funds of BNA and the Republic are not commingled.

A declaration by Juan Carlos Fábrega, BNA's General Manager since 2003, offers similar statements. Fábrega has been an employee of BNA since 1969. He states that since becoming General Manager, he has never been "instructed or improperly pressured" "by a member of any branch of the Republic with regard to BNA's business or operations." He also states that BNA does not receive appropriations from the Republic or commingle funds with the Republic's funds. Specifically, any profits earned by BNA are used for the bank's "commercial purposes," in accordance with the charter.

In spite of the legal protections provided for BNA's independence, and the claims of BNA officials that the Republic does not interfere with the bank's operations, plaintiffs contend that there is considerable historical

evidence that the Republic exercises significant control over BNA. Plaintiffs have submitted Argentine laws and media reports to support their allegations. Most of the allegations are contested by BNA through the Fábrega declaration. These allegations may be organized into four categories.

Plaintiffs first claim that the government has repeatedly compelled BNA to make certain financial commitments without regard to the impact of these commitments on BNA. One form of these commitments has been financial assistance to troubled companies. In 1993, for instance, BNA was required to enter into agreements with state-owned corporations to provide financial assistance to them. Fábrega, however, characterizes this effort as a voluntary agreement by which BNA agreed to provide temporary financing to these companies to facilitate the privatization of these companies. According to Fábrega, the companies were required to repay BNA at the completion of this process. In 2002, the Republic allegedly required BNA to take over three troubled banks. Fábrega, however, states that BNA merely performed administrative functions to facilitate the sale of these banks to other financial institutions, and was compensated for this work. In 2007, BNA was apparently ordered "to lead the rescue of" a "troubled" retailer. According to Fábrega, BNA was not required or pressured to participate in this restructuring effort, and that effort has turned out to be profitable for BNA.

Plaintiffs contend that the government required BNA to make loans

on terms that were unduly favorable to their recipients. Plaintiffs claim that the Republic mandated these loans to garner political favor for the Republic's leadership. In 1997, for instance, BNA was allegedly required to establish a mortgage program for low-income families. According to Fábrega, however, this program was actually run by another bank, Banco Hipotecario Nacional, which BNA later acquired. In 2004, and again in 2007, BNA was required to refinance its existing loans to farmers at terms favorable to the farmers. According to Fábrega, this actually involved an interest rate subsidy paid for by the Republic, not BNA, and this program applied to all banks, not just BNA. In 2008, BNA was apparently required to offer loans to small businesses, under terms specified by the government. Fábrega does not offer a response to this allegation. Also, in 2003, BNA was allegedly ordered to lease its unused office space to private companies as a political reward to the president's supporters. Fábrega contends that this did not happen.

Plaintiffs also point to three ways in which BNA acts as an "arm of the government." First, BNA collects federal tax revenues for the government and then redistributes them to the federal and provincial governments. According to Fábrega, although BNA does provide "the service of receiving funds or being a depository on behalf of the tax authorities" (and then remits the funds to the appropriate governmental authorities), the bank is not "charged with the collection of taxes." In one instance, BNA's Tokyo

representative was appointed by presidential decree to serve as "the government's financial agent to Japan." Plaintiffs also note that BNA is appointed by law to administer a species of government funds called "fiduciary funds," without compensation or the ability to resign. These funds, and BNA's role in their administration, has been described by the court in an earlier opinion. EM Ltd. v. Republic of Argentina, No. 03 Civ. 2507, 2009 WL 2568433, at *2-3 (S.D.N.Y. Aug. 18, 2009).

Plaintiffs further claim that BNA is "chronically unprofitable," and is therefore dependent on the government for its survival. The primary evidence of this is that the Republic invested 2.5 billion pesos in BNA between 2004 and 2008. Fábrega asserts that these investments were the direct result of the 2001 financial crisis in Argentina, and a consequent need to satisfy claims by depositors. BNA also benefits from the Republic's guarantee of its operations, a "near-monopoly on deposits by the government," and tax exemptions. In response to this general set of allegations, Fábrega claims that in recent years, BNA has had strong financial results, and is one of the most successful banks in Argentina. With regard to the tax exemptions, Fábrega notes that these exemptions have never actually been implemented, and that BNA is therefore still subject to taxes.

Finally, plaintiffs claim that BNA's chairman and directors are dependent on the president of the Republic for their positions and

compensation. As a result, BNA has had nine chairmen in the last thirteen years. Plaintiffs allege that this high rate of turnover is partly the result of the fact that on three occasions in the last seven years, BNA's chairmen have been forced to resign because they disagreed with government policy. One of these resignations happened only two days after the chairman took office. In response, BNA contends that part of the explanation for the turnover is that when a chairman resigns in the middle of his term, his successor may only complete the prior chairman's term, and must therefore be replaced at the beginning of the next four-year term.

Asset Pledge Accounts

Asset pledge accounts are established pursuant to New York Banking Law, which requires foreign banks operating in New York to deposit assets at other financial institutions "for the maintenance of a sound financial condition, the protection of depositors and the public interest, and to maintain public confidence in the business of" the bank. N.Y. Banking Law § 202-b(1). A foreign bank may liquidate its New York business. Banking Law § 605 (11). When the bank liquidates or is seized by state regulators, the asset pledge accounts (and the bank's other assets) are used by the New York State Banking Department to satisfy the claims of the bank's creditors. § 606(4)(b). Once all such claims are satisfied, the Banking Department is required to give any surplus funds to other U.S. offices of the bank or the bank's principal office.

-13-

§ 606(4)(b).

The orders of attachment and the restraining orders in the present case are phrased somewhat differently. But the intention of both is to reach BNA's interest in receiving surplus funds in the event that a liquidation of BNA's New York business occurs and in the event that funds remain after satisfying creditor claims.

Plaintiffs have served 3,000 financial institutions seeking to find asset pledge accounts. But the record before the court contains information about only one such account, at HSBC Bank USA. In any event there is no evidence that a liquidation of BNA's New York business is contemplated.

The Republic's Assets

The Restraining Orders cover any assets of the Republic in a garnishee's custody. This resulted in the restraint of the funds held in the following two accounts at BNA's New York branch: over $3.2 million held on behalf of the Agencia Nacional de Promoción Científica y Tecnológica, a division of the Republic's Ministry of Science, Technology, and Productive Innovation ("the ANPCT account"), and about $2000 held by the Instituto Nacional de Tecnología Agropecuaria ("the INTA account").

The Republic has submitted a declaration of the Legal Director of ANPCT that sets forth the following facts. ANPCT was created "under the auspices of the [Republic's] Ministry of Culture and Education" and, among

other things, administers a program that issues grants for scientific research. This program provides a "line of financing" to grantees for the purchase of "technical equipment" for scientific research in Argentina. The grantee "generally handles all arrangements for a particular equipment contract," and ANPCT then "pays the purchase price to the seller." Specifically, when the grantee "signs an equipment contract," ANPCT "transfers funds for the purchase to an account at" BNA's New York branch. The Republic does not dispute that ANPCT is part of the Republic.

With respect to the INTA account, the Republic claims that INTA is a separate entity from the Republic. In support of this claim, the Republic has offered a declaration by INTA's president, which claims that INTA is a legally and financially independent entity created "to promote scientific research concerning agriculture and cattle ranching." Plaintiffs do not offer any contrary evidence, but do request permission to seek additional discovery from the Republic with respect to the INTA account.

Discussion

The Alter Ego Issue

The Republic does not control the day-to-day operations of this large commercial bank, BNA. However, this does not completely answer the alter ego question. For purposes of this litigation, the essential question is whether the Republic had the power to use, and did use, BNA's funds as if they

were the funds of the Republic. Was this the substance of what occurred, even though transactions might be given some other formal appearance, such as using the vehicle of loans? The evidence indicates that there were instances when the Republic required BNA to do financing for certain economic sectors of the country and for particular businesses. But, in the view of the court, these circumstances did not add up to a degree of de facto ownership or control of BNA's funds sufficient to justify an alter ego ruling.

Something much closer to the alter ego territory occurred in late 2008 when the Republic procured a change in the bank's charter which greatly loosened the restrictions on the ability of the Republic to borrow money from BNA. This change was made in November 2008, which was two months after the signing of the attachment and restraint orders in the present action. It is surely true that what the Republic had the power to do in November 2008, it had the power to do two months earlier. Also, the revised ground rules offered the potential for the Republic to use BNA's funds effectively as the Republic's own. However, the record in this case does not show any actual use by the Republic of this expanded power to borrow from BNA. Since no actual loan transactions have been shown, there is no evidence of actual amounts, actual terms, actual repayments or the failure of repayments, etc. The court concludes that even the evidence about the expanded power of the Republic to borrow from BNA is not sufficient to justify holding that BNA was or is the alter

-16-

ego of the Republic.

It should be recalled that the reason plaintiffs seek to have BNA deemed the Republic's alter ego is that plaintiffs are attempting to reach the asset pledge accounts, which may in fact be only one such account, the one at HSBC. The court is aware of the law that contingent rights can be attached and restrained. But, from a practical standpoint, the contingency here, if there is one, is remote in the extreme. Nothing would actually be recovered by plaintiffs unless BNA's business in New York were to be liquidated and something was left after satisfaction of BNA's normal obligations in New York. BNA is an old bank, and there is no evidence that it, or its New York branch, is going to be liquidated.

The Republic's Assets

Under familiar law applicable to this case, assets of the Republic itself located in New York may be attached if used for commercial activity. 28 U.S.C. § 1610(d). Under the most rudimentary definition, the ANPCT account must be said to be used for commercial activity. The ANPCT funds have been used to purchase scientific equipment. The Republic has been acting as a "private player" in the marketplace, in the same way as any private party engaging in commerce. The fact that the ultimate purpose had to do with the promotion of Argentine cultural policies does not invalidate this conclusion. The relevant section of the Foreign Sovereign Immunities Act provides that "the

-17-

commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(a).

The court therefore holds that plaintiffs are entitled to their restraints as to the ANPCT.

However, plaintiffs are not entitled to restrain the INTA account. According to the present record, INTA is an independent entity. The court does not believe that further discovery as to the status of INTA is justified.

## Conclusion

Since the orders of attachment relate only to the asset pledge account or accounts, and are based on the alter ego argument, plaintiffs' motion to confirm the orders of attachment is denied and the orders are vacated.

To the extent that the restraining orders cover the asset pledge account or accounts, plaintiffs' motion to confirm the restraining orders is denied and the restraining orders are vacated.

To the extent that the restraining orders cover the ANPCT account at BNA, plaintiffs' motion to confirm the restraining orders is granted. Plaintiffs are entitled to execution to partially satisfy judgments.

To the extent that the restraining orders cover the INTA account, plaintiffs' motion to confirm the restraining orders is denied and the restraining

orders are vacated.

Defendants' motion to dismiss the separate action seeking a declaration that BNA is the alter ego of the Republic, is granted.

Settle any appropriate further orders.

SO ORDERED.

Dated:   New York, New York
         September 30, 2009

_____
THOMAS P. GRIESA
U.S.D.J.